IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | 11 C 8605 |
| v. | ) ) | Judge Ronald A. Guzmán |
| ALL KNOW HOLDINGS, LTD., SHA CHEN, SONG LI, LILI WANG, ZHI YAO, XUECHU YANG, and YONGHUI ZHANG, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The United States Securities and Exchange Commission ("SEC") sued Yonghui "Harry" Zhang, All Know Holdings, Ltd., Sha Chen, and Zhi Yao (collectively, "Defendants"), among others, for insider trading in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Defendants move for summary judgment. Zhang moves individually while All Know Holdings, Ltd., Sha Chen and Zhi Yao (the "All Know Defendants") move together. For the reasons stated herein, Zhang's motion is denied while the All Know Defendants' motion is granted.

Because the Defendants moved for summary judgment in two different groups, the Court will address the motions separately.

**I.  Summary Judgment Standard**

A party may move for summary judgment on a claim or defense and the motion shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether a genuine dispute of material fact exists, the court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Id.* at 255. It is not for the court at summary judgment to weigh evidence or determine the credibility of a witness' testimony. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 623, 630 (7th Cir. 2011).

**II.     Zhang**

   A.     Facts

Zhang is a United States citizen who currently resides in Beijing, China. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 156, ¶ 1.) He was born in China and received a Bachelors degree in Biology from the University of Science and Technology in Hefei, China and a Doctoral degree in Pathobiology from Columbia University ("Columbia") in New York in 1996. (*Id*. ¶¶ 2, 3.) After performing postdoctoral research and working at both Albert Einstein College of Medicine and Columbia, Zhang returned to China in October 2010 to start his own gene diagnostics company. (*Id*. ¶¶ 4-6.) Beginning in November 2010, while he applied for funding for his company, Zhang also worked full time for Global Education & Technology Group, Ltd. ("GEDU") in China. (*Id*. ¶ 6.) GEDU was founded by Zhang's younger brother, Yongqi "David" Zhang and David's wife, Xiadong "Veronica" Zhang. (*Id*. ¶ 7.) Prior to joining GEDU on a full-time basis, Zhang worked for GEDU on an intermittent basis between 2007 and 2010 and gave himself the title of "Executive Director." (*Id*. ¶ 8.) While the parties dispute whether Zhang ever had any involvement in GEDU's financial decisions, they agree that he held the position of Chief Consultant – Overseas Study Division while at GEDU, providing advice to GEDU's student-clients about higher education in the United States, both in one-on-one consultations and at seminars sponsored by GEDU. (*Id*. ¶¶ 8-11.)

On November 21, 2011, Pearson plc and GEDU publicly announced they had reached an agreement for Pearson to acquire GEDU (the "Pearson Acquisition"). (*Id*. ¶ 12.) GEDU's American Depository Shares ("ADS") traded on the NASDAQ. (Def.'s Resp. Pl.'s Stmt. Add. Facts, Dkt. # 170, ¶ 1.) On the last trading day before the Pearson Acquisition was announced, Zhang purchased 7,900 GEDU ADSs in his E*Trade brokerage account for approximately $39,500.00. (*Id*. ¶ 5.) Zhang had never before bought GEDU stock for himself (*Id*. ¶ 6.) As a result of this trade, Zhang made a profit of over $47,000.00. (*Id*. ¶ 7.)

   B.     Analysis

"A person is liable for insider trading when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose, and then (c) misappropriates or otherwise misuses that information (d) with scienter, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make 'secret profits.'" *SEC v. Berrettini*, No. 10 C 1614, 2012 WL 5557993, at *7 (N.D. Ill. Nov. 15, 2012) (citations omitted).

Generally, "there are two theories under which a breach of fiduciary duty can be established such that a violation of Rule 10b-5 arises: (1) classical theory, and (2) misappropriation theory." *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). "Classical theory applies to trading by *insiders* (or their tippees) in the *stocks of their own corporations*." *Id*. (emphasis in original). The misappropriation theory "extends the reach of Rule 10b–5 to *outsiders* [or their tippees] who would *not ordinarily* be deemed *fiduciaries of the corporate entities in whose stock they trade*." *Id*. (citation and quotation marks omitted and emphasis and

2

alterations in *Maio*). Here, the SEC proceeds under the classical theory. Zhang contends that the SEC's insider trading allegations were made "on information and belief" and that it has elicited no evidence during discovery that Zhang possessed material, nonpublic information at the time he purchased the GEDU stock. Therefore, he argues, he is entitled to summary judgment.

The SEC may establish insider trading through circumstantial evidence. *SEC v. Garcia*, No. 10 C 5268, 2011 WL 6812680, at *12 (N.D. Ill. Dec. 28, 2011) (citing *SEC v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007) ("Direct evidence is rarely available in insider trading cases, since usually the only witnesses to the exchange are the insider and the alleged tippee, neither of whom are likely to admit to liability."). While Zhang contends that the circumstantial evidence in this case is insufficient to defeat summary judgment in his favor, the Court disagrees and concludes that the SEC may present its case to a jury.

First, Zhang's office at GEDU was on the same floor as his brother and sister-in-law's offices, and between October 1 and November 18, 2011, Zhang had "numerous communications" with them and other members of GEDU's senior management who had knowledge about the Pearson Acquisition. (Def.'s Resp. Pl.'s Stmt. Add. Facts, Dkt. # 170, ¶¶ 12-14.) Prior to the public announcement of the Pearson Acquisition, Pearson employees met with GEDU management on at least four occasions in the conference room on the ninth floor of GEDU's offices to the discuss the acquisition. (*Id.* ¶ 12.) Although he never previously purchased GEDU stock for himself, Zhang bought 7,900 shares the last trading day before the Pearson Acquisition was announced. (*Id.* ¶¶ 5, 6.) Zhang spent more than three times his annual salary to make the purchase, which was the largest and most expensive securities purchase he had ever made on a single day. (*Id.* ¶¶ 6, 7.) Moreover, in response to an interrogatory asking for him to "[d]escribe in detail and identify every reason for [the GEDU] purchase," Zhang stated that he had wanted to replace GEDU shares he had previously purchased for two colleagues. (*Id.* ¶ 19.) Later, at his deposition, Zhang reiterated that in November 2010, he had purchased 800 shares of GEDU on margin for his friends, Lei Zhang and Jing Chen, but the shares had been liquidated due to margin calls by his brokerage firm. (*Id.* ¶ 20.) He further testified that while he purchased the GEDU shares on November 18, 2011 to replace the shares he had bought for his colleagues, he also stated that 7,100 of the 7,900 shares he bought on November 18, 2011 were for himself and that he purchased on that date because the stock price was low and he believed it was going to rise. (*Id.* ¶ 21.) Zhang's deposition testimony that the November 18, 2011 purchase was not just to replace the shares for his colleagues but also to buy for himself was different from his earlier interrogatory response in which he stated that his purchase was only to replace his colleague's shares.

Zhang argues that because he testified had no knowledge of the Pearson Acquisition and the SEC has not identified a specific tipper, he is entitled to summary judgment, citing *Garcia*, 2011 WL 6812680, at *9, *13. But Zhang's reliance on *Garcia* is misplaced. In that case, the court noted that the SEC was asking it to take the "unprecedented" step of letting a jury decide that the defendant could be guilty of insider trading "even though the SEC has *no indication that [the defendant] knew an insider*." *Garcia*, 2011 WL 6812680, at *9 (emphasis added). The

3

court granted summary judgment to the defendant and stated that "some connection to an insider is essential in an insider trading case, and in this case there is no such evidence." *Id*. Here, not only were Zhang's brother and sister-in-law founders of GEDU and its Chief Executive Officer and Chairman of the Board, respectively, but it is also undisputed that Zhang worked in the GEDU offices and had numerous communications with his brother and sister-in-law prior to the date of his purchase of GEDU stock. Thus, *Garcia* is inapposite.

Zhang faults the SEC for failing to point to any particular phone records, emails, airline tickets, meetings or other specific communications or opportunities to communicate between Zhang and those with knowledge of the acquisition, including his brother and sister-in-law. Although the SEC sought details (including the date, location, method, and substance) of conversations Zhang had with insiders, Zhang failed to provide such details, stating only that "[b]y virtue of the[] personal and professional relationships [he had with the insiders], from October 1 to November 30, 2011, Zhang had numerous communications with these individuals." (Def.'s Resp. Pl.'s Stmt. Add. Facts, Dkt. # 170, ¶ 14.) Given Zhang's failure to provide details of the "numerous communications" he participated in, the Court cannot conclude that the SEC's failure to provide such details necessarily precludes the possibility of a jury verdict in its favor. *See SEC v. Compania Internacional Financiera S.A.*, No. 11 Civ. 4904(JPO), 2012 WL 1856491, at *4 (S.D.N.Y. May 22, 2012) ("More significantly, it is entirely possible that the Commission's failure to uncover smoking-gun evidence of a tipper is a result of the problems it has encountered with discovery, including Defendants' failure to provide fulsome discovery in this case.").

Moreover, contrary to Zhang's unsupported assertion that a jury would be "more likely to conclude the discussions [with his brother and sister-in-law] were about work or family matters," the Court cannot ascertain at this time what a jury would conclude based on the evidence before it at trial. Certainly, it would not be unreasonable to conclude considering the totality of the circumstantial evidence that the conversations included the sharing of insider information. Finally, the Court notes that Zhang's brother, David, ordered GEDU's information technology department to erase his emails from the hard drive that was being created in response to a subpoena by the SEC. (*Id.* ¶ 26.) While the Court is not drawing an adverse inference regarding the content of those deleted emails, it simply notes that the SEC's ability to gather specific information regarding communications by Zhang was impeded by the conduct of Zhang's brother – another reason that the Court is unwilling to conclude that a lack of specificity dooms the SEC's case.

The SEC's evidence includes the following: (1) Zhang's office at GEDU was on the same floor as his brother and sister-in-law's offices, and between October 1 and November 18, 2011, Zhang had "numerous communications" with them and other members of GEDU's senior management who had knowledge about the Pearson Acquisition; (2) although never having purchased GEDU stock for himself, Zhang bought 7,900 shares the last trading day before the Pearson Acquisition was announced; (3) Zhang spent more than three times his annual salary to make the purchase, which was the largest and most expensive securities purchase he had ever made on a single day, and (4) he made contradictory explanations for the purchase. Zhang has

offered his side of the story providing explanations for the timing of the purchase and the source of the funds. At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). Construing the facts in a light most favorable to the SEC, *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010), the Court denies Zhang's motion for summary judgment.

### III. The All Know Defendants

#### A. Facts

The facts regarding the Pearson Acquisition are recounted above and will not be repeated here. All Know Holdings Limited ("All Know") is a British Virgin Islands corporation engaged in the business of buying and selling stocks and wholly owned by defendant Sha Chen. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 164, ¶ 1.) All Know has no employees, but Sha Chen's friend Estelle Zhou, who lives in Shanghai, provides some administrative services to All Know without pay. (*Id.* ¶ 2.) Sha Chen is a citizen of the People's Republic of China ("PRC") and at all times relevant hereto was a resident of Shenzhen City, Guangdong Province, China. (*Id.* ¶ 3.) She only knows a little bit of English and does not speak the language. (*Id.*) Defendant Zhi Yao is a PRC citizen and at all times relevant hereto a resident of Yaan, Sichuan Province, China, although at or about the time of the securities trading at issue herein he believes he was in Beijing. (*Id.* ¶ 4.) His English proficiency is almost zero. (*Id.*) Ray Chen is Sha Chen's older brother, who holds Masters degrees in Computer Science from Tsinghua University in Beijing and the University of Pennsylvania, along with a Masters of Business Administration from the University of California at Berkeley. (*Id.* ¶ 5.) Jun Yao, who is not a defendant, is Zhi Yao's older brother who lives in the Philadelphia area but travels to China to pursue business prospects about half the year. (*Id.* ¶ 6.)

Zhi Yao, who grew up with Chen and has been a lifelong friend, was employed at an auto parts manufacturer as a sales representative. (*Id.* ¶ 10.) He left that position on his own volition because of health issues and currently supports himself through his securities trading. (*Id.*) According to Zhi Yao's deposition testimony, his investment philosophy includes (a) a focus on China-based U.S. public companies with which he is familiar (either through research or other knowledge), many of which he believes are undervalued because of specious attacks by short sellers; (b) a focus on candidates for offers to take the company private; and (c) making relatively large bets on companies with which he has no previous investment experience. (*Id.* ¶ 12.) The SEC disputes that the All Know Defendants' GEDU trading is indicative of their practice of making "big bets" on companies with which they had no prior experience. (*Id.*) The SEC also disputes that Zhi Yao was responsible for the All Know Defendants' investment decisions, as it contends that the brokerage firm's records reflect that Ray Chen and Jun Yao, not Zhi Yao, accessed the All Know Defendants' brokerage accounts and placed the GEDU trades. (*Id.*)

Zhi Yao testified that on or about November 15, 2011, he was researching ChinaCast

5

Education Corporation ("Cast"), an education business that had announced that it had received an unsolicited offer to acquire its stock at a significant premium over the market price, which caused the price of Cast stock to increase 21%. (*Id*. ¶ 13.) Believing that these privatization offers translate to other companies within a single business sector, Zhi Yao ran a search on imeigu.com for peer companies, which pointed him to a number of companies that had not yet received a privatization offer, including GEDU. (*Id*. ¶ 14.) Zhi Yao testified that he was familiar with GEDU because of its high profile in China; his brother Jun Yao called it "very famous." (*Id*. ¶ 16.) When researching GEDU on November 15, 2011, Zhi Yao saw that the cash holdings of the company as reported on imeigu.com on that day, expressed on a per ADS basis, was "$5-plus." (*Id*. ¶ 17.)[1] After performing additional research, the All Know Defendants began buying GEDU on November 16, 2011, three business days before the Pearson Acquisition announcement. (*Id*. ¶ 21.)

Additional GEDU shares were purchased on behalf of the All Know Defendants (the parties dispute who actually did the purchasing), on November 17 and 18, 2011. (*Id*. ¶ 26.) On November 16, 2011, All Know's account purchased 110,000 GEDU ADSs in multiple transactions at an average price of $3.51, which represented 40.50% of GEDU ADS trading volume for that day. (Defs.' Resp. Pl.'s Stmt. Add'l Facts, Dkt. # 175, ¶ 9.) On November 17, 2011, All Know's account purchased 994 GEDU ADSs at an average price of $3.50. (*Id*.) On November 18, 2011, All Know's account purchased an additional 37,959 GEDU ADSs at an average price of $4.99. (*Id*.) On November 16, 2011, Zhi Yao's account purchased 18,400 GEDU ADSs at an average price of $3.50 per share. (*Id*. ¶ 10.) On November 17, 2011, Zhi Yao's account purchased 14,594 shares of GEDU in twenty-two transactions at an average price of $3.67 per share. (*Id*.) On November 18, 2011, Zhi Yao's account purchased an additional 10,000 GEDU shares at an average price of $4.73 per share. (*Id*.) On November 17, 2011, Sha Chen's account purchased a total of 16,550 GEDU ADSs in multiple transactions at an average price of $3.83. (*Id*. ¶ 11.) On November 18, 2011, Sha Chen's account purchased an additional 28,771 shares in multiple transactions at an average price of $4.98. (*Id*.)

These trades were the first time that the All Know Defendants purchased GEDU or any other education company. (*Id*. ¶ 12.) The combined cost of the All Know Defendants' GEDU purchases was approximately $950,000.00. (*Id*.) After making their final purchases on November 18, 2011, the All Know Defendants had substantial amounts of cash remaining in their accounts with which they could have made additional purchases. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 164, ¶ 28.) The All Know Defendants' profited by over $1.55 million from their GEDU trading, which was by far their most profitable trading. (Defs.' Resp. Pl.'s Stmt. Add. Facts, Dkt. # 175, ¶ 15.)

On November 16, 2011, Jun Yao's wife, *i.e*., Zhi Yao's sister-in-law, whose annual salary was $90,000, and was the family's sole source of income, purchased 11,500 shares of GEDU in her brokerage account for $40,257.00. (*Id*. ¶ 51.) Jun Yao's wife first considered

---

[1] Each GEDU ADS consisted of four ordinary shares. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 164, ¶ 16.)

purchasing GEDU shares on November 16, 2011 after Jun Yao called her and recommended that she do so. (*Id.* ¶ 52.) She did not do any research before purchasing GEDU and used all of the available cash in her brokerage account, which was an IRA, and her mother's brokerage account to purchase the shares. (*Id.*) Jun Yao's wife financed her GEDU purchase by selling 5,000 shares of another stock, which she had purchased only a few days earlier for $39,992. (*Id.*) Jun Yao testified that he told his wife she should purchase "some" GEDU, but did not tell her to make a heavy bet on GEDU, and did not convey to her any sense of urgency in making the purchase. (*Id.* ¶ 53.) His wife testified that Jun Yao told her to buy GEDU as quickly as possible. (*Id.*)

Ray Chen, has a friend and business partner, Michelle Fang a/k/a Fang Fang ("Michelle Fang"), who works for an investment firm in Hong Kong. (*Id.* ¶ 54.) On November 18, 2011, Michelle Fang purchased 10,000 shares of GEDU for $51,457.00. In December 2011, following the GEDU acquisition announcement, Ray Chen received $300,000.00 from Michelle Fang and transferred those funds into All Know's brokerage account. (*Id.* ¶ 55.) Both Ray Chen (who claimed not to have communicated about GEDU in advance of the acquisition announcement) and Jun Yao (who testified that he only spoke with his wife, brother, and Ray Chen) denied communicating with Michelle Fang about GEDU in advance of her purchases. (*Id.* ¶ 56.)

The SEC challenges many of the All Know Defendants' explanations for their GEDU purchases, noting changes and contradictions in certain All Know Defendants' testimony. (Pl.'s Stmt. Add'l Facts, Dkt. # 163, ¶¶ 19, 20, 22, 26, 27, 29.) The SEC also notes that Sha Chen never attempted to obtain nor produced telephone records for November 2011 despite being asked for the records in initial expedited discovery and subsequent Federal Rule of Civil Procedure 34 requests. (*Id.* ¶ 21.) While the All Know Defendants produced phone records for certain months beginning in May 2012, they did not produce any records for 2011. (*Id.*) In addition, the SEC sets forth Ray Chen's relationship to All Know Holdings and the discrepancies in his testimony regarding his knowledge of the All Know Defendants' GEDU purchases. (*Id.* ¶¶ 30-35.) Finally, the SEC lays out in detail the whereabouts of Ray Chen and Jun Yao at the time leading up to and of the GEDU purchases and certain laptop computers from which the GEDU purchases were made. (*Id.* ¶¶ 36-49.) The Court notes these items but does not recount them in detail as the specifics are not relevant to the ultimate disposition of the motion.

    B.    <u>Summary Judgment Analysis</u>

As noted above, "there are two theories under which a breach of fiduciary duty can be established such that a violation of Rule 10b-5 arises: (1) classical theory, and (2) misappropriation theory." *Maio*, 51 F.3d at 631. "Classical theory applies to trading by *insiders* (or their tippees) in the *stocks of their own corporations*." *Id.* (emphasis in original). The misappropriation theory "extends the reach of Rule 10b–5 to *outsiders* [or their tippees] who would *not ordinarily* be deemed *fiduciaries of the corporate entities in whose stock they trade*." *Id.* (citation and quotation marks omitted and emphasis and alteration in *Maio*). "For a tippee to be held liable under a misappropriation theory, the SEC must prove that he knew or should have known that the information given to him was improperly obtained." *Roszak*, 495 F. Supp. 2d at

7

886.

The SEC admits that it has no evidence identifying the purported tipper. As a result, the All Know Defendants assert that they do not know the theory under which the SEC intends to prove a breach of fiduciary duty and, therefore, cannot prepare a defense and the trier of fact cannot render a verdict. The Court finds the argument unavailing since the "elements required for tippee liability are the same under the classical and misappropriation theories." *SEC v. McGee*, 895 F. Supp. 2d 669, 682 n.34 (E.D. Pa. 2012) (citing *SEC v. Yun*, 327 F.3d 1263, 1276 (11th Cir. 2003)) ("[T]here is no reason to distinguish between a tippee who receives confidential information from an insider (under the classical theory) and a tippee who receives such information from an outsider (under the misappropriation theory).").

Nevertheless, the Court acknowledges the All Know Defendants' reticence regarding the reach of circumstantial evidence. Is it appropriate for this Court to conclude that the SEC has provided sufficient circumstantial evidence of insider trading such that the case can go to a jury when it admits that it cannot point to the All Know Defendants having had access to inside information or contact with an insider? As already noted above with respect to Zhang's motion, another court in this district said no and granted summary judgment to a defendant because, in part, the SEC was asking it to take the "unprecedented" step of letting a jury decide that the defendant could be guilty of insider trading "even though the SEC has no indication that [the defendant] knew an insider." *Garcia*, 2011 WL 6812680, at *9. While not precedential, the Court has considered the *Garcia* opinion in ruling on the instant motion.

The Court notes on the one hand that the SEC's circumstantial evidence is compelling. The SEC points out that the All Know Defendants purchased hundreds of thousands of dollars of GEDU stock in the three days preceding GEDU's acquisition announcement, the trades were quite profitable and atypical of their prior securities trading, the All Know Defendants' friends and business associates also purchased large amounts of GEDU stock over the same three days and the All Know Defendants provided, at least according to the SEC, implausible and contradictory explanations for and varying accounts of how the trading occurred. As already noted, however, the SEC lacks any evidence that any of the All Know Defendants knew or had contact with an insider. For their part, the All Know Defendants offer a detailed explanation of their trading strategies, the basis for their knowledge of GEDU and the timing and amount of their GEDU purchases.

Based on its review of the law and facts of this case, the Court concludes that the All Know Defendants' motion must be granted for the following reasons. First, the lack of any evidence as to an insider, which may or may not be dispositive, is troubling. While the SEC contends that identifying a tipper is not an element of an insider trading claim, *see Compania Int'l Financeria*, 2012 WL 1856491, at *5 (denying defendant's summary judgment motion based on the SEC's inability to identify its tipper because "[d]efendants conflate the

8

Commission's failure to identify a tipper with their own success on the merits")[2], establishing a breach of fiduciary duty is. Even assuming that the SEC's circumstantial evidence establishes the first four elements of insider trading (the Court does not so conclude here), the evidence fails to address whether the information purportedly procured by the All Know Defendants was disclosed in breach of a fiduciary duty and whether the All Know Defendants knew or should have known of the breach. An example is illustrative of the problem with the SEC's position. As noted by the Supreme Court, "[i]n determining whether a tippee is under an obligation to disclose or abstain, it thus is necessary to determine whether the insider's 'tip' constituted a breach of the insider's fiduciary duty." *Dirks v. SEC*, 463 U.S. 646, 661 (1983). Thus, "[a]ll disclosures of confidential corporate information are not inconsistent with the duty insiders owe to shareholders." *Id*. at 661-62. "[T]he test is whether the insider personally will benefit, directly or indirectly, from his disclosure." *Id*. at 662. "Absent some personal gain, there has been no breach of duty to stockholders" and "absent a breach by the insider, there is no derivative breach." *Id*.

Indeed, in *Dirks*, while Dirks had received material non-public information regarding fraud at the subject company and had repeated the allegations to members of the investment community who sold their stock in the company, the Supreme Court concluded that there was no actionable violation by Dirks of the insider trading laws. *Id*. at 665. Dirks was a stranger to the company and had no pre-existing duty to its shareholders nor did he take any action that would have caused shareholders to place trust in him. *Id*. Dirks himself did not misappropriate any information and the tippers did not violate their fiduciary duties in providing information to Dirks because they derived no personal or monetary benefit from the tip and were "motivated by a desire to expose the fraud." *Id*. at 665-66.

Admittedly, the facts of this case differ from *Dirks*, but the point is that the inquiries

---

[2] The SEC's additional citation to *SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001), for the proposition that the tipper need not be identified is inapposite, and if anything, supports the Court's conclusion in the instant case. In *Thrasher*, the SEC alleged that defendant Hirsh had received from defendant Sanker privileged information, which Sanker had received from his roommate, Harris, who had obtained the information from defendant Thrasher, a company insider. *Id*. at 294-95. Hirsh argued in his motion for summary judgment that he could not be liable for insider trading because he could not have known of Thrasher's breach. *Id*. at 304. The Court rejected this argument, stating that "Rule 10b-5 requires that the defendant subjectively believe that the information received was obtained in breach of a fiduciary duty . . . . [and] [s]uch belief may . . . be shown by circumstantial evidence." *Id*. at 304-05 (citation and internal quotation marks omitted). Because Sanker testified that he told Hirsh the information was "privileged" information that "came from a source inside [the company]," the SEC had met its burden of pointing to sufficient circumstantial information that the tippee, Hirsh, knew that the insider breached a fiduciary duty, despite the fact that Hirsh may not have known the identity of the insider. *Id*. at 305. In contrast to *Thrasher*, here the SEC has pointed to no evidence of any connection to an insider by the All Know Defendants, let alone any evidence that they knew or should have known that a breach occurred.

regarding the elements of an insider trading claim, particularly as to the breach of fiduciary duty, can be complex and nuanced. The SEC has pointed to no evidence in this case from which a jury could reasonably conclude that the unidentified tipper breached a fiduciary duty by disclosing material non-public information, or that the All Know Defendants knew or should have known that there had been a breach.

In addition, the Court notes that in all of the cases in this district cited by the SEC, a tipper (or some source of information) has been identified. *See, e.g., Berrettini*, 2012 WL 5557993, at *9 (tipper identified); *SEC v. Steffes*, 805 F. Supp. 2d 601, 611 (N.D. Ill. 2011) (defendant-employees "pieced together" information); *Roszak*, 495 F. Supp. 2d at 887 (tipper identified); *SEC v. Van Wagner*, No. 97 C 6826, 1999 WL 691836, at *2-3 (N.D. Ill. Aug. 23, 1999) (source of information identified for one defendant and tipper identified for other defendants ); *SEC v. Saul*, No. 90 C 2633, 1991 WL 133738, at *5-8 (N.D. Ill. July 12, 1991) (tipper identified). The same is true for cases cited by the SEC from other jurisdictions. *SEC v. Tang*, No. C-09-05146 JCS, 2012 WL 10522, at *1 (N.D. Cal. Jan. 3, 2012) (defendant was employee of private equity fund with access to inside information); *SEC v. Hollier*, No. 6:09-CV-0928, 2011 WL 201451, at *1 (W.D. La. Jan. 18, 2011) (tippee received tips from member of company's board of directors); *SEC v. Palermo*, No. 99 CIV 10067(AGS), 2001 WL 1160612, at *1 (S.D.N.Y. Oct. 2, 2001) (tippee received inside information from friends who had received information directly from company employee); *SEC v. Singer*, 786 F. Supp. 1158, 1161 (S.D.N.Y. 1992) (tippee had business and personal relationship with member of company's board of directors). Here, the SEC has pointed to no connection whatsoever between the All Know Defendants and anyone with knowledge of or any source of information regarding the Pearson Acquisition.

Nor is the SEC's reference to the court's statement in *Compania Int'l Financeria* that "[d]efendants conflate the Commission's failure to identify a tipper with their own success on the merits" persuasive. *Compania Int'l Financeria*, 2012 WL 1856491, at *4. This was dictum used in a ruling on the SEC's motion to voluntarily dismiss its complaint without prejudice. Indeed, in its brief in support of its motion, the SEC acknowledged the importance of identifying a tipper when it stated that "[a]s the Court is aware, Compania and Coudree have repeatedly insisted that they traded for legitimate reasons based on public information – and if they are correct, *the staff will be unable to identify a leak of inside information to them and thus would not refile the case*." (Pl.'s Mot. Dismiss Compl. Without Prej., Dkt. # 108, *SEC v. Compania Int'l Financeria S.A.*, No. 1:11-cv-4904-JPO, at 11 (S.D.N.Y. Feb. 10, 2012) (emphasis added).)

The SEC argues that the All Know Defendants' obstructionist behavior during discovery provides additional circumstantial evidence from which a jury could conclude that the All Know Defendants had engaged in insider trading. However, the Court has concerns with this position in light of the SEC's failure to identify a tipper, particularly absent any motion by the SEC or order by this Court regarding the purported discovery abuses. Rather than asking the Court or a jury to make logical leaps from the circumstantial evidence to a finding of insider trading (including the requisite breach of fiduciary duty), the SEC should have moved for an order compelling disclosure, *see* Fed. R. Civ. P. 37(a), and if the All Know Defendants still did not

comply, discovery sanctions. *Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 649 (7th Cir. 2012) ("[I]f defendants thought that plaintiffs had failed to perform their obligations under the rules, they should have asked the district judge for a sanction before discovery closed rather that waiting (as they did) until their motion for summary judgment."). Assuming sanctions were warranted, they could have included, for example, a finding by the Court that the information not provided by the All Know Defendants established contact with an insider. *See* Fed. R. Civ. P. 37(b)(2)(A)(i). Such a finding could have filled in the gaps they are now asking the trier of fact to flesh out. The SEC, however, made no such motion.

In light of these points, the Court grants the All Know Defendants' motion for summary judgment.

      C.      <u>Motion for Rule 11 Sanctions</u>

Defendants have filed a motion for sanctions asking that the Court: (1) hold the SEC liable for the attorneys' fees that the All Know Defendants have incurred in the course of prosecuting their Summary Judgment Motion (with fees to be proven via submission of an attorney declaration should the Court grant this motion); (2) hold the SEC liable for the attorneys' fees that the All Know Defendants have incurred in the course of bringing the instant motion for sanctions made necessary by the SEC's conduct (with fees to be proven via submission of an attorney declaration should the Court grant this motion); and (3) issue a written reprimand to the SEC because the SEC, despite being warned to desist, has unreasonably and vexatiously prolonged this litigation by failing to voluntarily dismiss the Second Amended Complaint. According to the All Know Defendants, they approached the SEC at the time the complaint was filed, presented evidence to explain the trading and asked the SEC to discontinue the action against them given the lack of any evidence regarding contact with an insider. The All Know Defendants essentially assert that, while knowing of the purportedly fatal deficiencies in their case, the SEC continued to prosecute this action against the All Know Defendants because the All Know Defendants failed to respond candidly during discovery.

Federal Rule of Civil Procedure 11 empowers the Court to "impose an appropriate sanction on any attorney . . . or party" that has presented a document to the Court "for any improper purpose" such as harassing the opposing party or that contains unsupported legal or factual assertions. Fed. R. Civ. P. 11(b), (c). "The purpose of both Rule 11 and section 1927 is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs also bear them." *Kapco Mfg. Co., Inc. v. C & O Enter., Inc.*, 886 F.2d 1485, 1491 (7th Cir.1989) (per curiam) (citations omitted). Sanctions may only be imposed if a party exhibits "a callous disregard for governing law." *Allison v. Dugan*, 951 F.2d 828, 834 (7th Cir. 1992). A single district court opinion cannot constitute controlling precedent sufficient to support a sanctions motion. *TMF Tool Co. v. Muller*, 913 F.2d 1185, 1191 (7th Cir. 1990).

No controlling precedent from the Seventh Circuit exists at this time as to whether the SEC's failure to identify a tipper or establish any contact between the All Know Defendants and a potential tipper proves fatal to an insider trading claim as a matter of law. Moreover, the SEC

pointed to other circumstantial evidence in support of its claim. The Court cannot conclude that the SEC's position was legally unsupportable. Nor does it find that the SEC pursued the action solely to harass the All Know Defendants. While the SEC acknowledges that it did not dismiss the case against the All Know Defendants because of the defendants' purported dishonesty during discovery (SEC's Resp., Dkt. # 188, at 3.), this constituted part of its circumstantial evidence supporting its case.

For these reasons, the motion for sanctions is denied.

### IV. Conclusion

For the reasons stated above, Zhang's motion for summary judgment [142-1] is denied while All Know Holdings, Ltd., Sha Chen and Zhi Yao's motion for summary judgment [145-1] is granted. All Know Holdings, Ltd., Sha Chen and Zhi Yao's motion for leave to file Chen's declaration [178-1] is granted. The All Know Defendants' motion for sanctions [182-1] is denied. The SEC and Zhang shall appear for a status on June 19, 2013 at 9:30 a.m. in order to set a trial date.

**Date**: June 10, 2013

*[Signature: Ronald A. Guzmán]*

**United States District Judge**
**Ronald A. Guzmán**